The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is Jose Ernesto Menjivar Bonilla v. Merrick B. Garland, Appeal No. 19-1165. Attorney Rado, please introduce yourself for the record and proceed with argument. Good morning again. May it please the Court. I'm Rachel Rado. I'm appearing on behalf of Mr. Jose Ernesto Menjivar Bonilla, the petitioner in this matter. With permission, I would ask to reserve two minutes for rebuttal. Yes, you may have the two minutes. Thank you. Mr. Menjivar Bonilla is a native and citizen of El Salvador who first came to the United States in August of 2012, fleeing El Salvador after suffering past persecution based on his political views. He was apprehended by border officials and the government issued an order of expedited removal at that time. The government prepared a sworn statement alleging that the petitioner had given a false name, the name Jose Ramos Ibarra, and that he had testified that he had no fear of returning to El Salvador. He was therefore returned to El Salvador around October of 2012 and re-entered the United States in November of 2012 when he was not apprehended by the government at this time. After being apprehended by ICE later in 2018, he demonstrated a reasonable fear of return to El Salvador at the Boston Asylum Office during a reasonable fear interview. And his individual hearing at the Boston Immigration Court was conducted on August 20, 2018, where he sought withholding of removal and cap. The IJ denied his applications based on concerns with credibility, although not making a credibility finding. And the BIA affirmed without opinion in January of 2019. We are submitting today that the IJ violated Mr. Menjivar's due process rights by placing an undue weight on the sworn statement that was initially taken from him in August of 2012 at his first entry. And by having issues with his credibility and including this sworn statement as part of those concerns, requiring Mr. Menjivar to corroborate his testimony without making an explicit credibility finding also violated his due process rights. We argue that the petitioner's due process rights were violated due to the weight made on this sworn statement. This sworn statement is subject, when looking at documents prepared by ICE, these documents normally enjoy some sort of presumption of reliability unless there are details to suggest error or foul play. When also looking at evidence that's submitted in immigration court, we are able to use the federal rules of evidence as guidance in determining whether evidence submitted to the court comports with due process. Documents prepared by ICE and the government fall under the public records exception. However, we're arguing today that there is also an exception to this public records exception, which includes records compiled by law enforcement personnel. Because these interactions are between law enforcement and defendants or respondents in this matter, are inherently adversarial and therefore require closer examination. In this case, Mr. Menjivar-Bonilla is alleged to have given the name Jose Ramos Ibarra. However, during testimony in this case in front of the IJ, he denied using that name. And when looking at the actual document, the name on top of the document has his correct name, Jose Menjivar-Bonilla, or an AKA of Ernesto Menjivar-Bonilla, which is his middle name. However, it does not list the name Jose Ramos Ibarra. Did he tell the IJ that he recognized the name? Initially, on cross-examination, he did testify that when asked who was Jose Ramos Ibarra, that that was another man who was attacked during the trial in El Salvador. So, I think you may have turned away from your speaker there for just a second, from your microphone. Can you hear me on it? That's better. Okay, thank you. So, initially he did testify in cross-examination that when asked who Jose Ramos Ibarra was, that that was a man who was a taxi driver in El Salvador that he knew. So, how would the border agent have come up with that name if he hadn't received it from your client? Well, I guess we could only assume what could have happened. So, many people do enter at the same time. Later in testimony on cross and when asked by the IJ, he testified that he had been mistaken and he actually did not know who this person was. There were many documents submitted. Ms. Rado, when you look at that document, and I'm looking at the interview sheet, I noticed that it was said that the questions occurred in Spanish and it has his name at the beginning, as you said. And then it has the questions in English with English answers. But he speaks Spanish, correct? He speaks Spanish, Your Honor, yes. And does not speak English. It says that the document was read to him and he signed it. Was it translated to him before he signed it? It says that it was read to him. We don't know if it was translated to him or not, Your Honor. Because the way I'm hearing it, if I go through this, if it was read to him, it would have said, they would have read to him, it would have said, reading the document, what is your true name? And he would have answered, Jose Ramos Ibarra. And then he signed this whole thing under his name, Ernesto. So, I'm just wondering whether there's anything to suggest that the document was translated to him before he signed it. I don't believe that there is. And that would further lead to an irregularity in the document, Your Honor. Because if he signed this document with his true name, however, he's asked what his name is in the Q&A, and the name is Jose Ramos Ibarra, and he says he hasn't used any other names, that would lead, that leads to our argument that there is an irregularity in this document.  However, it does strongly suggest that there's an error in this document where someone signed a different name than what's given in a Q&A. And this other name, Jose Ramos Ibarra, is not listed as a name in the signature or in the top of the document, so I would suggest that there's an irregularity. I think that the issue is that initially on cross-examination, he did say that he knew who that person was. However, he later corrects that, and there could have been many reasons why he initially said that he knew who this person was. He did submit taxi documents showing that he had been a taxi driver in El Salvador. This was a high-pressure situation where he was detained, and when asked who this person was, he may have believed that that was who he was being asked about. However, he does correct it multiple times, and does state that he never gave this name to border officials. He never admits to giving the name to border officials, although the judge says in his decision that he does admit to giving this name to border officials. So, there was never an admission of using this name. The only conflicting testimony would be that he said that he knew who the person was. I'm just trying to tease out the various arguments you're making. So, one argument is that the document was excludable, shouldn't have been admitted at all, and since some reliance was made on it, that would suggest you'd have to vacate. Another set of arguments that you were just making seem to go to the weight that it should be accorded it, which is not an argument for excluding it, which seems like a different set of arguments. And then this last point you just made is an argument that the district court mischaracterized his testimony about it, and that's an error. Of those three buckets of arguments, which ones were made to the BIA? So, the argument that was made to the BIA was that there was undue weight on the sworn statement. Okay, so there was not an argument that it should have been excluded made to the BIA? The public records argument was not made to the BIA, no, that it was excluded. And then this last argument about the contention that the IJ mischaracterized his testimony about the document, was that made to the BIA? I believe so, Your Honor, yes. So, just let me get it straight then. The two arguments that you raised to the BIA that are now being raised on appeal is one, that more weight was accorded to it than should have been, and then two, regardless of that, the IJ's decision was premised on a mischaracterization about his testimony about that document? Yes, and also that he required corroboration of the testimony without making the explicit credibility finding, Your Honor. And then on that last point, my understanding is that there is no... If you don't make an explicit credibility finding, you can still conclude that the burden has not been satisfied of showing the needed grounds for asylum. And that a reason to reach that conclusion can be predicated on the fact that the story, when considered in its totality, even assuming the person is credible, because there's no corroboration, doesn't suffice to meet that burden. That's correct. Okay, given that state of the law, putting aside this point about whether the IJ mischaracterized the testimony, assuming it didn't do that, just put that to one side, what is wrong with what the BIA did? Because as I understand it, since the IJ did not make an adverse credibility finding, the IJ then makes a judgment that this story, at least without corroboration, isn't enough to meet his burden. And then the BIA affirms that if it does follow the law, as you say it must have, it, too, didn't treat him as being incredible. But it, too, could have concluded that he simply hadn't met his burden because of the lack of corroboration and the fact that there was this other document that wasn't excludable, but at least pointed somewhat in a different direction. What would be wrong with concluding that that's what happened, the BIA just didn't err? So, our argument is that they agreed that the weight given to the sworn statement was appropriate, Your Honor. By affirming the decision of the IJ that they're in agreement, the weight was... What that argument means, exactly, in the sense that if it's not excludable, it can be given some weight. So, I guess I'm just trying to figure out how would we evaluate this degree of weight when we're kind of on almost like a clear error standard when it comes to how much weight to give testimony. Understood, Your Honor. However, I would argue just based on... We are making this public records exception argument. Let's put that aside since that wasn't made to the BIA. Understood, Your Honor. Well, looking at the totality of the testimony and the corroborating evidence that was submitted in this case, we're arguing that there was an error on the part of the IJ and the BIA in finding that this was not a corroborated or credible claim for withholding our cat. Ms. Rado, if I accept your argument that the 2012 statement should have not been given as much weight as it did or maybe should have been given almost no weight, don't you still have the problem that whatever is left isn't sufficient to meet the burden? Well, when looking at whatever is left, the petitioner did submit evidence that was available to him. As I mentioned, he was detained, but he was able to submit documents of his son's medical condition. One of the issues that IJ had was that he did not submit evidence that the son was not treated based on the petitioner's political views. However, this is evidence that would be almost impossible to get. This is still a ruling political party. I can't imagine a situation where you're able to get a letter from a hospital saying we didn't treat this child because his father was a member of the Arena political party. So I think that that's almost impossible to get. He also did submit evidence that he was a taxi driver. However, he wasn't able to submit evidence of the tickets that he received as a taxi driver, or I believe it was the tickets, and that he received up to five tickets per day. That was one of the issues that the IJ had. These are documents that, while being detained and after being here for six years, were impossible for him to get. And he testified that he was unable to get certain documents because he didn't want to put his mother and siblings in harm. And that's... That's time. Thank you. Thank you. Are there any more questions for Ms. Rado? Thank you. You've reserved two minutes for rebuttal. Thank you. Good morning, Your Honor. May it please the court, Jessica Daugert for the Attorney General. The court should deny the petition for review because substantial evidence supports the agency's determination that Mr. Bonilla failed to meet his burden of proof for withholding of removal and cat protection. As the Supreme Court recently ruled, a reasonable fact finder is free to credit part of a witness's testimony without accepting it all, and that is precisely what happened here. Here, the agency reasonably ruled that Mr. Bonilla failed to meet his burden of proof with credible evidence that he was attacked, harassed, and that his son was denied medical treatment because of his political opinion, and that he would be persecuted for that reason. Ms. Rado, do you read... Do you read the IJ's decision to have reached that conclusion in part because of the weight it gave to the statement to the Border Patrol agent? Yes, in part. There are three reasons that the IJ identified. So as long as... As long as that's part of it, that part of the reasoning has to hold up, right? Otherwise, we have to vacate. Perhaps. And I say perhaps because there are many components. And the first component is the statements to the Border Patrol agent in 2012 was the first of the three instances. But it was not only that he gave a name that he later said he did not know. It was the way that he testified to the agent. And so it was the statement that... Immigration judges' consideration of his statements at that time in 2012 and his later backtracking from providing those statements that the immigration judge used to question his credibility. Ms. Duggar, what do you have to show that he said to the agent, my name is Jose whatever during that interview. And what you have is you have a document that he has signed, but it doesn't say this document was read back to me, translated back to me. It says it was read, but it doesn't say it was translated. You don't have the signature of a translator. You don't have a signature of an agent saying that this is what happened. You have nothing that would give me any assurance that what happened wasn't that the agent pulled up the last interview back up on her file, as we all do, using documents you use as a template. The last one, typed in his name, started answering some of the questions, maybe got distracted. That was it. Printed it out. He signed it. And I guess, what do I have to suggest that there's any fact that he actually said on a document that he was signing Ernesto that he said, my name is Jose? I have three reasons. The first is that although the language does not say this was returned, this was read to you in the end in Spanish, it does say in the Spanish language. And it says interpreter none. I'm sorry, where did it say? On page 412 of the record, on that first page of the record of sworn statement, in the bottom line of the first bracket at the top, it says in the Spanish language, interpreter none. Maybe the top third of the page. So, the interview happened in the Spanish language. Correct. Got that. Correct. The reason I ask this is that I know that when you don't have a border patrol agent who can do the questions yourself, that you get someone up on the line and do the interview through them. Correct. At least in the one experience that I've heard in my courtroom where this was raised, that call was disconnected once the questions were done. So, the question I'm asking you is, once you ask the questions, you've got a printer, you hit the printer, you hand it there, is someone going through now and reading it and reading the answers? Or is it like when you sign for a mortgage and you go into the bank and they give you it? You don't read every single line again. They say sign here, sign here, sign here, and you do that. And I guess, do I have anything here in front of me? I mean, normally we do. Normally we say this was translated into, from the English and Spanish and the best of my whatever. I have a series of questions and answers in English. Yes. So, the presumption of regularity that attaches to this document, coupled with the fact that it was conducted in Spanish, that no interpreter was needed because it was conducted in Spanish. And on the second page, on the next page of the record at the bottom, the border patrol agent signed it. So, after it was printed, the border patrol agent signed the document. But he didn't sign that it's true and correct. He signed that I witnessed Ernesto signing it. Well, the signature is that that person conducted the interview. Five minutes, counsel. Thank you. And so, and I actually, I don't want to distract away from the value of that, the record of sworn statement. But there are other reasons why that's not just positive to them. In this case. Well, when you say there are other reasons, when you say there are other reasons, this takes me back to Judge Barron's question. I think, as you pointed out, the IJ cited three reasons. But one of them was some way given to this document. And he didn't say that each reason was by itself sufficient to support his conclusion. Rather, he pointed to all three points collectively. And so, if we subtract one of those points, how do we know what the IJ would have decided if reduced to just two points? But we don't subtract one of those points. Even if we find that the document itself may not be reliable. Even if this court finds that that document is not reliable. I think the fact that Mr. Bonilla testified at the beginning, when he was first asked and confronted with this document as impeachment evidence, that he knew who Jose Ramos Ibarra was. And he said, it's on page 126 of the record. Let me just ask you about that. What is the inference that you would have us draw, that the IJ draw from the question, what is your true and correct name? Answer, Jose Ramos Ibarra. Isn't the inference you're asking us to draw is that he gave a false name for himself to the border control agent? No, I think it's a little more nuanced than that. I think that the inference that needs to be drawn here is not that he used more than one name. It's that he admitted to knowing that person. And then when confronted with impeachment evidence and realized that he was going to be confronted with false statements that he had made that may have been contrary to what he was testifying to, he changed his testimony. So, starting at page 126 of the record, he said that he knew who Jose Ramos was and that it was a coworker and they were doing the same kind of work. And then the rest of the sworn statement from 2012 was brought to his attention. Well, sir, didn't you tell the United States in 2012 that you were not afraid of returning to El Salvador in 2012? And once he realized that he was being confronted with those prior statements, he changed his testimony. He didn't correct it. He changed it and said, I don't know who Jose Ramos is. So, it's the fact that he changed his testimony when confronted with negative testimony in the past that is reasonable to consider. I'm not sure I completely follow. Is your view that the I.J. did not, we could tell that the I.J. did not draw the inference that he first represented himself to have a different name? No, I think he did. But I think the important part of that... I'm just saying, on that threshold question, since that's a piece of what the I.J.'s overall assessment of the story is, if that piece is vulnerable, we have to vacate. I'm not sure you have to vacate, because I would refer the court to... How about this? Assume we do. Okay, so let's just isolate on that question how vulnerable that is. One argument for why it's vulnerable is the call that we just had with Judge Talwani as to why we might doubt that the mere fact... We just lost Judge Barron there. I think he's back now. Okay. Ms. Doggo, we're just going to ask you to wait a minute or two here. Of course. I apologize. I don't fully understand what just happened, but I'm back. Okay, I'm ready to go. All right. I think we're back on track here. Suffice it to say, Ms. Doggo, we won't count that time against you. He counted against me. I think you were just about to argue, ask why we give any weight more or less to the... As I understood, one reason to do so would be because he signed the document, and then we just went through why that may raise the question whether that's a good answer. But the second piece of it would be he testified to it being his name. But as I understand it, there's a question raised by your opponent whether that's a fair characterization of the testimony. Is it a fair characterization of the testimony? That's a two-part answer, Your Honor. No, it's not. I believe that the immigration judge reasonably interpreted the testimony to recognizing that he changed his testimony, and then considering the fact that he changed his testimony... I understand that. But that would be an additional piece of the reason to discount the overall story the person was telling. But so long as a piece of the reason the IJ gave for discounting it was that he had earlier given a different name, I'm just trying to figure out what in the record provides substantial support for that finding. If it's not the fact of his signature, and it can't be that he testified to it because he didn't, what would suggest that he gave a different name? Only the presumption of regularity attached to the immigration court documents. But I would like to also note, Your Honor, I know you asked Ms. Rado about what was exhausted before the board. That's time, counsel. You can finish. If I could just answer this quickly. I would refer the court to page 16 of the record because the excludability was actually the only issue that was raised to the board. The weight and the mischaracterization of the testimony was not raised to the board and therefore should not be considered as a dispositive matter before this court. I do have one additional question. How do you, when you look at the border statement, record of sworn statement, there is a line on that where it says statement by and it identifies him and any AKAs. And then his signature conforts with that. So how could, how could he have possibly said during the interview that his name was something different? All I can answer is that none of us were there and the record of presumption of regularity of these documents attaches. Right, but that's a presumption. It's pretty odd to say that he was misleading the border agent by giving an alias when the first item on the, is the statement of him by his proper name and then he signs it in his proper name. Well, it could have been a document that he was using. Oftentimes people use documents for work authorization and that's the document that's found in their wallet when they cross the border. I mean, there could be many situations that would result in someone having a different identity or a different name when they were approached by border agents. And then when they're fingerprinted, a different name comes up. He's then asked, have you ever used any other name? And he says no. And then 10 seconds later, he signs it in another name. It seems pretty improbable. I personally would have asked a follow up question. I agree. I don't understand. But again, all I can say is is that the importance of that was that Mr. Bonilla had recognized the name and then testified that he did not recognize the name. And his effort to detract from statements that he had provided previously that were adverse to him should have been weighed. And even if the court does not consider that, all of the other statements that the immigration judge considered reasonably were determined that he just did not present a credible claim for relief. Even if we take away the record of sworn statement and all of the concern about whether or not he had lied to agents. We don't have a clear finding that the IJ held that view. That's a view that the IJ could hold, but we just don't have on this record any decision by the IJ that indicates it made that conclusion. I think we do. If you look at the immigration judge's decision and says what we have left in terms of credible claims, we have a credible claim that he was a taxi driver. We have a claim that we have credible evidence that he was a taxi driver and that he says that he was a member of the ARENA political organization, although he did not corroborate that. And he says that he was attacked on July 20th of 2012, although he did not corroborate that. And the evidence that he did present was materially conflicting. And he says that he was given all of these tickets, although he says he had the tickets but did not present them to the court and admitted that he did not present them to the court. And he said that his son was denied medical treatment. Hold on. You're making a case for how you could come out that way. I'm just trying to figure out what indicates that the IJ came to the conclusion based solely on what you're now reciting and not also in part because of the name. And I thought there's just nothing in the indication of the IJ's decision that makes it clear it did that. Well, what I'm reciting is findings that were made by the IJ. The IJ first questioned his credibility and the veracity of his claims but then went through each of those statements and said we don't have the burden. He has not met his burden in establishing each of these components that he claims. And that's the crux of the decision. It's not a credibility determination. It's a burden of proof determination. And the immigration judge weighed the evidence that was presented before him and reached a conclusion. Thank you, Ms. Dogger. Thank you very much. Ms. Rado, I believe you have two minutes. Thank you very much, Your Honor. Just going back to this one statement from the voter in August 2012, the name was not the only issue in this document. He was also asked when the last time  the United States was and the answer on that document is March 2012. There's no evidence by the government that the petitioner entered the United States in March of 2012. The petitioner testified that the harm that he faced was in July of 2012 right before he came to the United States in August of 2012. So this is another issue with this document that just doesn't make sense. Before you end, your opponent suggested that you had not raised the weight issue. You had only raised an excludability issue. I'm not entirely sure what that is referring to given that you say you didn't raise the excludability issue in the due process sense. So I'm just wondering what exactly is your view as to what was raised and where can I find that? Yes. I'm looking right at our brief to the BIA. The issue presented whether the IJ earned in finding that the documents prepared by ICE during Mr. Bonilla's first attempt to enter the U.S. were inherently reliable. So we would argue that he determined the weight based on determining if they were reliable or not and whether they should be used or not. So it's all... My argument would be that it's all part of one argument, Your Honor. And the grounds you gave for it not being reliable were the grounds we've just been covering in this argument? Exactly. Okay. Exactly. So as I was mentioning, if he had entered in March of 2012 and not been stopped by immigration, why would he be entering again in August of 2012? And if he had been stopped, there would be a government record. So this is just another piece of this that is showing that this document either was a mix-up with another individual... Time, counsel. You may finish. Thank you very much. Or a mix-up with another individual or there's just incorrect statements on this document. So I would argue that this document should not have been used or given any weight in determining credibility. Thank you very much. Thank you, counsel. That concludes argument in this case. Attorney Arado and Attorney Daggard, you should disconnect from the hearing at this time.